**MGIC INDEMNITY CORPORATION, Plaintiff-Appellee,**

v.

**HOME STATE SAVINGS ASSOCIATION, Defendant-Appellant.**

No. 85–3171.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 16, 1986.

Decided July 28, 1986.

David C. Greer (argued), Bieser, Greer & Landis, Dayton, Ohio, A. Mark Segreti, Jr., for defendant-appellant.

Gary D. Bullock (argued), David P. Kamp, Cincinnati, Ohio, for plaintiff-appellee.

Before JONES and NELSON, Circuit Judges, and PECK, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This case presents a question of coverage under a policy of director and officer liability insurance. The policyholder, Home State Savings Association, settled certain criminal charges against it by agreeing to make restitution of fees it had received from commercial customers for standby loan commitments. One of the main considerations that led Home State to accept a settlement requiring restitution of the fees was that its officers would thereby be protected from the filing of criminal charges against them individually. Home State contends that in making restitution it "indemnified" the individual officials for "loss," within the meaning of these terms as used in the policy, and is entitled to be paid therefor by the insurer, MGIC Indemnity Corporation. The trial court granted summary judgment in favor of MGIC, holding that there had been no "loss" and no "indemnification" therefor. We agree with the trial court, and we think the judgment should be affirmed for the further reason that the threshold condition in the insuring agreement of the policy was never met.

## I

Under the terms of the policy's insuring agreement, the insurer agreed "that if, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of the Association, all Loss for which the Association is required to indemnify or for which the Association has, to the extent permitted by law, indemnified the Directors and Officers."

Section I of the policy, captioned "Definitions," provides in part that:

"(d) The term 'loss' shall mean any amount which the Directors and Officers are legally obligated to pay or for which the Association is required to indemnify the Directors or Officers, or for which the Association has, to the extent permitted by law, indemnified the Directors and Officers, for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgments, settlements, costs (exclusive of salaries of officers or employees), and defense of legal actions, claims or proceedings and ap-

peals therefrom, and cost of attachment or similar bonds; provided however, such Loss shall not include fines or penalties imposed by law or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

"(e) The term 'Wrongful Act' shall mean any actual or alleged error, misstatement, misleading statement, act or omission or neglect or breach of duty by the Directors or Officers in the discharge of their duties solely in their capacity as Directors or Officers of the Association, individually or collectively, or any matter claimed against them solely by reason of their being Directors or Officers of the Association."

Home State received loan commitment fees of more than $795,000. Some of the customers who paid these fees subsequently contended that the loan commitments they received were illusory. By letter dated April 11, 1980, an Assistant United States Attorney advised an attorney for Home State that the Association and five of its individual officers were considered to be targets of a grand jury investigation then being conducted with respect to the Home State situation.

On October 28, 1980, the United States Attorney filed a two count criminal information charging Home State with having violated 18 U.S.C. §§ 2314 and 1341 by obtaining loan commitment fees through fraudulent representations as to the nature and bankability of commitments for which the fees were paid. No individual officer of Home State was charged. Under a proposed plea agreement with Home State and the individual officials, Home State was to plead nolo contendere to the information and make full restitution of loan commitment fees totaling $795,435.44, while the United States was to forego seeking or pursuing criminal charges against any of the individual officers. The plea agreement was subsequently modified to drop the individual officers as parties, and was approved in that form. In separate letter agreements with the individual officers, the government agreed not to seek or pursue criminal charges against the individuals in return for their agreement to cooperate in the investigation of Home State's loan commitment practices and their agreement to refrain from participation in any commercial standby commitment programs for a period of ten years.

After repaying its customers as promised in the plea agreement, Home State sought reimbursement from MGIC. MGIC denied the claim and brought the present action for a declaration of non-liability. MGIC moved for summary judgment, and the district court granted the motion. Home State appealed, and argues here that the district court erred in its construction of the policy and erred in granting summary judgment despite the existence of a disputed issue as to whether it was Home State's liability that was at stake prior to the plea agreement or the liability of the individual officers.

## II

Pointing out that the individuals did not personally receive any of the loan commitment fees, did not personally return any such fees, and were never legally obligated to return them, the district court concluded that there was no "loss" on the part of the individuals for which Home State could have indemnified them. There having been no indemnification, the court concluded, the policy did not require MGIC to pay.

As Home State correctly observes, the policy's definition of "loss" is not limited to an amount that the officials had paid or were legally obligated to pay. The definition also includes an amount "for which the Association has ... indemnified the Directors and Officers, for a claim or claims made against [them] for Wrongful Acts...." We must therefore ask whether the $795,000 payment made by the Association could have been made for "claims made against the Directors and Officers for Wrongful Acts."

MGIC concedes that the letter identifying the individual officers as targets of the grand jury investigation constituted a

"claim" of "Wrongful Acts" on the part of the officials within the meaning of the policy. That is not the end of our inquiry, however: a claim that a wrongful act has occurred is not the same thing as a claim for payment on account of a wrongful act. The insuring agreement, as we read it, requires a claim of the latter type.

■ The language of the insuring agreement that is critical in this respect precedes the promise to pay all loss for which the Directors and Officers have been indemnified, and it makes that promise a conditional one: the promise is only effective, according to the insuring agreement, "if, during the policy period, any claim or claims are made against the Directors and Officers ... for a Wrongful Act." The existence of claims "of" wrongful acts does not of itself mean that claims were made against the officials "for" the wrongful acts. Home State failed to show that any such claim was made against any director or officer during the policy period, and we think it was incumbent on Home State to make such a showing, or to show a bona fide dispute as to whether such a claim had been made, if MGIC's summary judgment motion were to be defeated.

The word "claim," to adapt a felicitous phrase of Mr. Justice Frankfurter, is one of those "words of many-hued meanings [which] derive their scope from the use to which they are put." *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 529, 70 S.Ct. 755, 772, 94 L.Ed. 1017 (1950) (Frankfurter, J., dissenting). Although "claim" often means "contention," that is not the use to which it has been put in the insuring agreement. If claims were made in the newspapers that directors and officers of Home State engaged in wrongful acts, those would obviously not be the kind of "claims" that could make MGIC liable under the insuring agreement. The agreement, as we read it, is speaking not of a claim that wrongdoing occurred, but a claim for some discrete amount of money owed to the claimant on account of the alleged wrongdoing. In context, it seems to us, the only kind of "claim or claims" that could trigger

the insurer's obligation to pay would be a demand for payment of some amount of money. Thus it is that the policy defines "loss" in terms of an "amount"—*i.e.*, an amount of money—which amount the officials are legally obligated to pay or for which amount they have been indemnified or are required to be indemnified.

Home State suggests that there was a *potential* for demands against the officials for the payment of money, but a mere potential for such claims is not enough to meet the condition imposed by the policy. The agreement was that MGIC would pay if, during the policy period, "claims *are* made against the Directors and Officers." (Emphasis supplied.) That condition is not satisfied, in our view, where claims might have been made during the policy period, but were not.

### III

We see no merit in Home State's assertion that summary judgment was inappropriate because of a factual dispute over whose liability was at stake. The trial court clearly recognized that the $795,000 payment made by Home State should be viewed as having been made for the benefit of the individual officials who might otherwise have been subjected to criminal prosecution or criminal liability.

### IV

Given our understanding of the kind of "claim or claims" referred to in the insuring agreement, it is unnecessary for us to address the remaining questions discussed by the parties. For the reasons indicated, the judgment of the trial court is AFFIRMED.